IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

GLORIA E. CARTER                    )
                                    )
              Plaintiff,            )
                                    )
       v.                           )        Case No. 07-0699-CV-W-NKL-SSA
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
              Defendant.            )

**O R D E R**

Plaintiff Gloria E. Carter ("Carter") challenges the Social Security Commissioner's ("Commissioner") denial of her application for disability and disability insurance benefits under Titles II and XVI of the Social Security Act, as amended ("the Act"). Carter has exhausted her administrative remedies, and jurisdiction is conferred on this Court pursuant to 42 U.S.C. § 405(g). Carter argues that the record does not support the ALJ's finding that she was not under a disability because the ALJ (1) improperly evaluated Carter's credibility, and (2) improperly evaluated the opinions of Carter's treating physicians. The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary.[1] Because the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole, the Court denies Carter's Petition.

## I.      Factual and Procedural History

---

[1] Portions of the parties' briefs are adopted without quotation designated.

1

### A.    Testimony of Gloria E. Carter and Lindsey E. Carter

At a hearing before the ALJ on January 11, 2007, Carter testified that she was born in 1958, was a high school graduate, and had worked as a laundry attendant since 1993. Carter was forty-six years old on May 17, 2004, the date she alleges she became disabled due to arthritis in her knees, ankles, wrists, hands, and elsewhere. Carter testified that she was a full-time employee throughout 2004 but had missed a lot of work because of her health issues.

Carter testified she was unable to work from May 4, 2004 until October 7, 2004, due to her medical conditions, but that her employer kept her on as a full-time employee because he valued her work. While Carter was still considered a full-time employee in January 2005, her hours were further reduced at that time from 37.5 hours per week to 21 hours per week. Her employer made special accommodations for her, allowing her to only work the hours that she felt capable. Carter stopped working entirely in March 2005.

At the time of the hearing, Carter was living in a home with her husband, Lindsey E. Carter ("Mr. Carter"). Carter testified that she performed only minimal housework and that Mr. Carter did basically everything for her. She stated that when she did do any housework, she tried to complete the task in twenty to thirty minute intervals, with a ten minute break in between. Carter said she had difficulty chopping and bending to put things into the oven, but she was able to do some cooking so long as she was not on her feet for very long. She stated that she did not leave the house alone because she did not feel strong enough to go out by herself and that she used a cane for support of her left knee. Carter testified that she had

difficulty sleeping, typically only getting fours hours of sleep a night, and described waking up with cramping in her legs and feet. She stated that she napped two or three times a week, but never felt rested. Carter said she experienced overall morning stiffness on a daily basis.

Carter testified that her arthritis was overall, affecting her hands, wrists, both knees, and both feet. She testified that she continued to have lower back pain down into her legs, despite two epidural shots. She described the pain as a sharp jolt which often caused her to fall. She noted that if she sat or stood for too long in one position, her back would hurt. Carter testified that she often wore braces on her wrists to massage her joints. She described the pain in her wrists as a constant, deep, throbbing achiness, exacerbated by changes in the weather. She stated she had difficulty grasping four days out of the week because of the pain. Carter said she experienced similar pain in her shoulders, making lifting difficult. She testified that she could lift ten pounds, but not on a repetitive basis. Carter described her left knee pain as a grinding, sharp, severe pain and said she experienced some pain in the right knee as well. Carter testified that the pain in her left knee occurs suddenly, causing her to have to use a cane for balance. She also testified that she elevated her legs three feet, three times during a typical day. Carter reported having to wear a brace on her left foot because it was collapsed due to the arthritis. Carter testified that she experienced numbness and tingling in her feet on a daily basis.

Carter testified that she took Hydrocodone, Vicodin, Synthroid, Lyrica, and Diclofenac. She reported that side effects of her medication included dizziness which caused

3

her to need to lie down two to three times during a day for a duration of thirty to forty-five minutes.

Mr. Carter also testified before the ALJ. He described his wife as "very active" when they first got married and very eager to work. He testified that Carter was no longer able to perform household tasks due to her medical condition, and that he had taken over those responsibilities. He testified that he acted as his wife's "crutch" when she was not using her cane. Mr. Carter reported that his wife spent a great deal of time lying down and resting because of her overall pain. He testified that she typically had to take some sort of pain medication, which resulted in drowsiness. He described that recently Carter had begun to fall on a daily basis. Overall, Mr. Carter testified that his wife was always "hurting in some way, shape, or form, whether it's her feet, her back, or her shoulders, or her neck."

**B.      Medical Treatment History of Gloria E. Carter**

Carter was evaluated or treated during the time period of her alleged disability by many physicians and institutions, including Baptist-Lutheran Medical Center, Rockhill Orthopaedics, The Center for Rheumatic Disease, Dr. Janice Langholz, M.D., Dr. Danny Gurba, M.D., Internal Medicine and Rheumatology Associates, Dr. Clifford Gall, M.D., and Rheumatology Specialists of Kansas City. What follows is a chronological account of her treatment as reflected in the record before the ALJ.

On March 24, 2004, Dr. Mark Suenram, M.D., ordered an MRI of Carter's left and right knees for evaluation of bilateral knee pain. The MRI of her right knee revealed a small focus of degeneration in the articular cartilage of the lateral femoral condyle, a tear of the

4

lateral meniscus, small joint effusion, and questionable mild tendinosis in the proximal patellar tendon. The left knee MRI revealed a small focus of increased signal in the lateral femoral condylar articular cartilage and a tear in the anterior horn lateral meniscus with degenerative changes in the posterior horn of the lateral meniscus. Dr. Suenram referred Carter to Rockhill Orthopaedics for further evaluation at that time.

Carter presented to Rockhill Orthopaedics on April 8, 2004, reporting a two month history of discomfort in both knees, right more than left. She described the pain as global around the knee, but more pronounced posteriorly than anteriorly, and reported that the pain was greater in her right knee than her left knee. Other symptoms reported included some catching and grabbing, pain with stair climbing, and numbness and tingling in the shins. Dr. Gerald Dugan, M.D., reported that Carter lacked 30 degrees flexion of the right knee and about 5 degrees of flexion on the left knee. She demonstrated global hypersensitivity with palpation about the right lower extremity. Carter had marked right knee pain with range of motion of her hip. Dr. Dugan reported that Carter walked with a marked antalgic gait[1] secondary to her right knee flexion. Dr. Dugan noted, based on Carter's subjective complaints and objective findings, his concern that there may be something more than just her knees creating the problem. He prescribed Carter crutches and scheduled follow-up for three to four weeks.

In May 2004, Carter underwent arthroscopic surgery on her right knee.

---

[1] "Antalgic" means "[c]haracterized by reduced response to painful stimuli." STEDMAN'S MEDICAL DICTIONARY 71, (28th ed. 2006). "Antalgic gait" therefore refers to a limp in which the gait is shortened on the side of the body experiencing pain to reduce the pain associated with weight-bearing on that side.

Case 4:07-cv-00699-NKL   Document 18   Filed 09/17/08   Page 5 of 30

Carter was admitted to Baptist-Lutheran Medical Center on May 4, 2004, with a four day history of fever, chills, mild neck tenderness, back pain and stiffness. Carter had a 103.9 degree fever, decreased appetite, right foot numbness, right knee pain, right eye twitching, constipation, headaches, back pain, and neck soreness.

On May 6, Carter underwent a lumbar puncture to rule out meningitis. Dr. Suenram discharged Carter later that day, noting that Carter was experiencing right knee pain and suffered from hypothyroidism and a potassium deficiency.

Carter first received treatment at The Center for Rheumatic Disease on June 29, 2004. Dr. Nabih Abdou, Ph.D., noted that x-rays of both knees revealed evidence of decreased joint space, particularly in the medial compartment without chondrocalcinosis[2] erosions or osteophyte formation. Dr. Abdou started Carter on Celebrex and Flexeril and recommended an exercise program for her knees and hips. Carter again presented to Dr. Abdou on July 13 with continued complaints of right knee pain, particularly with weight bearing. Dr. Abdou noted that Carter's knees showed persistent crepitus[3] in both joints, particularly on the right side.

In a July 22, 2004, letter Dr. Abdou opined that Carter suffered from left hip pain due to degenerative joint disease with decreased abduction and external rotation of her left hip,

---

[2] "Chondrocalcinosis" is the calcification of cartilage. *Id.* at 368.

[3] "Crepitus" refers to the "[n]oise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together as in arthritis and other conditions." *Id.* at 457.

6

and joint and moderately severe arthritis of the knees with associated swelling, tenderness, and synovial hypertrophy.[4]

Primary care physician Dr. Janice Langholz, M.D., began treating Carter in July 2004 for symptoms related to osteoarthritis and inflammatory polyarthralgias. On initial evaluation, Dr. Langholz noted symptoms of myalgia (muscle pain), arthalgia (joint pain), swelling, and stiffness in her knees, ankles, wrists, and hips. Dr. Langholz noted that Carter's right knee was swollen and warm with tenderness to palpation. Carter informed Dr. Langholz that her pain increased with prolonged standing. Dr. Langholz diagnosed Carter with joint pain in both her knees and hypothyroidism.

Carter returned to Rockhill Orthopaedics on August 25, 2004, reporting that her symptoms had not improved. She continued to have pain with weight-bearing and difficulty with full extension. On examination, Dr. Kam Fai Pang, M.D., noted that Carter was walking with a limp on the right side. She was unable to fully extend her right knee and complained of tenderness to palpation on the anterior knee joint. Dr. Pang noted that Carter had had a meniscus tear in the past, was experiencing chronic knee pain, chondromalacia,[5] and was showing early signs of degenerative joint disease.

The month after completing three months of physical therapy, Carter requested to return to work on a part-time basis. At that time Dr. Pang reported that Carter continued to walk with a slight limp and lacked 15 degrees full extension on her right knee.

---

[4] "Hypertrophy" is the "[g]eneral increase in bulk of a part or organ, not due to tumor formation." *Id.* at 929.

[5] "Chondromalacia," commonly called "runner's knee," is the softening of cartilage. *Id.* at 369.

In December 2004, Dr. Langholz completed a physical residual functional capacity ("RFC") questionnaire providing her opinion on Carter's work-related limitations. Dr. Langholz believed that Carter would have difficulty dealing with the stress of employment because of her chronic pain, and noted that her pain would frequently interfere with the attention and concentration needed to perform even simple work tasks. Dr. Langholz opined that Carter would be capable of standing/walking for less than one hour at a time and capable of sitting for two hours at a time. Dr. Langholz reported that Carter would need the ability to take unscheduled breaks every two to three hours during a eight hour workday for fifteen to thirty minutes in duration. Dr. Langholz further opined that Carter would have good days and bad days, and would likely miss more than four days of work per month as a result of her impairments.

On February 3, 2005, Carter was referred by Dr. Langholz to an orthopedist, Dr. Danny Gurba, M.D., for re-evaluation of her right knee. Dr. Gurba reported that an MRI of Carter's left knee showed a meniscal tear, but opined that her right knee was a much bigger issue. Previous x-rays of Carter's right knee revealed bone-on-bone contact consistent with advanced osteoarthritis. Carter told Dr. Gurba she was only capable of standing on her right knee for short periods of time and walking short distances before experiencing extreme pain. Dr. Gurba performed a total right knee replacement on April 1, 2005. An April 6, 2005, x-ray revealed a satisfactory total knee replacement.

On April 14, 2005, Carter presented to Dr. Langholz with complaints of increased swelling in her right foot following an April 1 knee surgery. A Doppler study showed a small clot in the right calf for which Dr. Langholz prescribed Coumadin.

Carter again sought treatment from The Center for Rheumatic Disease on April 18, 2005. She reported continuing pain in both knees, toes, metatarsophalangeal joints, tarsus of the right foot, ankles, wrists, and hands to Dr. Ann E. Warner, M.D. Carter further reported swelling in the right ankle and foot, as well as a worsening of her pain in the morning. Carter reported that her back was "doing pretty well lately." After a physical examination, Dr. Warner noted mild pain with full range of motion of the shoulders, left hip, and right ankle and pain to light touch of the right tarsus. Dr. Warner noted swelling of the right foot and ankle and a poor range of motion in the right knee. An x-ray of Carter's left knee revealed central osteophyte formation with intact joint space. Foot x-rays showed mild osteoarthrosis of the first metatarsophalangeal joints. Carter's sedimentation rate was 30, with a rheumatoid factor of 0, and a negative anti-CCP antibody. Dr. Warner diagnosed Carter with polyarthralgias (pain in multiple joints).

Carter returned to Dr. Gurba on May 12, 2005, for a six-week surgical follow-up. She complained of continued pain and swelling around the knee. Carter reported that she had fallen down the stairs two weeks before the follow-up and had felt a pop in her knee. Since the fall she had experienced swelling and bruising. After a physical examination, Dr. Gurba confirmed swelling around the knee and bruising down into Carter's calf. Dr. Gurba noted that Carter could actively extend to minus 40 degrees from a seated position and to minus 10

9

degrees when lying down but could not straight leg raise from either position. He recommended that Carter undergo another surgical procedure to explore the cause of her swelling and bruising. On May 17, 2005, she underwent a right knee surgery. Dr. Gurba diagnosed Carter with a hematoma post- total knee replacement caused by an adhesion tear.

On June 22, 2005, Dr. Warner reported that Carter's laboratory results were remarkable for evidence of systemic inflammation, a low positive rheumatoid factor, and a mildly elevated angiotensin converting enzyme level. She noted that the Depo-Medrol injection did not help very much, but that she was hesitant to diagnose rheumatoid arthritis because the rheumatoid factor was only low positive, the CCP antibody was negative, and there were no objective findings.

On July 7, 2005, Dr. Gurba completed a physical residual functional capacity ("RFC") questionnaire providing his opinion on the limitations associated with Carter's orthopedic impairments. Dr. Gurba opined that Carter would be capable of walking less than one block without rest or severe pain, and would not have the ability to walk on rough or uneven surfaces. Dr. Gurba opined that Carter would rarely be able to crouch/squat, climb ladders, or climb stairs, but could occasionally twist and stoop. Dr. Gurba noted that Carter's condition would produce good days and bad days. Dr. Gurba further noted that her symptoms would "frequently" interfere with the attention and concentration needed to perform simple work tasks.

On July 13, 2005, Dr. Warner completed a physical RFC questionnaire assessing Carter's work-related limitations. Dr. Warner opined that Carter would only be capable of

walking one block without rest or severe pain, and would not be capable of walking on rough or uneven surfaces. She further opined that Carter would be able to stand for two hours in an eight hour workday and could sit for six hours. She felt that Carter's pain would occasionally interfere with attention and concentration needed to perform simple work tasks. Dr. Warner stated that Carter would need the ability to take unscheduled breaks every two to three hours for five to ten minutes in duration. Dr. Warner noted that Carter was capable of occasionally lifting ten pounds, and was significantly limited in her ability to reach, handle, and finger. Dr. Warner opined that Carter would be capable of fine manipulation 30 percent of an 8 hour workday, grasping 20 percent of an 8 hour workday, and overhead reaching 5 percent of an 8 hour workday. Dr. Warner estimated that Carter would likely miss work about two days per month as a result of her impairments.

In August 2005, Dr. Langholz referred Carter to the Internal Medicine & Rheumatology Associates. Carter described her symptoms and past medical history to Dr. John Ervin, M.D. On August 5, 2005, Dr. Ervin reported marked tenderness in Carter's right knee and swelling in her left lateral ankle. Laboratory data showed a positive rheumatoid factor and elevated ESR.[6] Dr. Ervin also noted a very mildly positive angiotensin converting enzyme of undetermined significance. He diagnosed Carter with seropositive inflammatory joint disease compatible with rheumatoid arthritis and apparent prior degenerative arthritis of the right knee.

---

[6] "ESR" stands for erythrocyte sedimentation rate. *Id.* at 672. It is a measure of the amount of inflammation in the body.

On August 9, 2005, Carter reported to Dr. Langholz that she was having difficulty swallowing and monthly episodes during which she felt her throat was closing up. Dr. Langholz diagnosed Carter with hypothyroidism, episodic neck spasms, and rheumatoid arthritis or chronic knee pain.

On September 15, 2005, Dr. Warner noted that an x-ray study of both of Carter's hands revealed nothing out of the ordinary.

On October 5, 2005, Dr. Warner reported that Carter had not improved on Plaquenil with regard to her joint pain. Carter told Dr. Warner that she was experiencing dry eyes. Dr. Warner opined that this could be a symptom of either Sjogren's syndrome or sarcoidosis,[7] but was reluctant to start Carter on any inflammatory medication without a definite diagnosis.

Carter underwent a bone scan on October 6, 2005, that revealed an increased uptake about the ankles and metatarsals of both feet which was consistent with degenerative change. Dr. Warner noted that prior x-rays did not show degenerative changes in these locations, suggesting that the increased uptake was due to articular inflammation.

On October 18, 2005, Dr. Gurba referred Carter to Alliance Radiology for an MRI of her lumbar spine following complaints of lower back pain extending into her right leg. The MRI revealed a slight thickening of the distal nerve roots with minimal clumping, disc degenerative change from L3-4 and L5-S1, broad-based disc protrusion at L3-4 with mild foraminal stenosis, and broad-based disc bulge at L4-5 and L5-S1 with bilaterally foraminal stenosis.

---

[7] Sjorgen's syndrome and sarcoidosis are immune system disorders. *Id.* at 1719.

On October 20, 2005, Carter continued to ache all over, most prominently in the ankles and feet, reporting that she felt "sickly." Dr. Warner noted that chronic pain was difficult to interpret, due to Carter's "sick role behavior and hypervigilance," but that Carter did appear to have an inflammatory arthritis, possibly associated with sarcoidosis. Dr. Warner prescribed 400 milligrams of Plaquenil daily and a low dose of methotrexate.

Carter presented to Dr. Clifford Gall, M.D., on November 16, 2005, with complaints of back and bilateral leg pain, and weakness and numbness in her legs. On examination, Dr. Gall reported that Carter's reflexes were symmetrically depressed and that both toes were down going into the Babinski maneuver. Given Carter's symptoms, Dr. Gall noted the possibility of a lumbar disk herniation or spinal stenosis. Dr. Gall further noted that a MRI did not demonstrate a significant disk herniation at any level, so he was unable to provide a definite diagnosis or recommendation for surgery. He opined that arthritic changes in her legs could also be responsible for some of her leg pain. Dr. Gall's recommendations included possible epidural steroid injections, physical therapy, or acupuncture.

In November of 2005, Carter underwent an epidural steroid injection in her lumbar spine at L5.

Carter reported some improvement on methotrexate during a December 14, 2005, follow-up with Dr. Warner. Dr. Warner opined that this provided further support for the possibility of an inflammatory polyarthritis.

On April 9, 2006, Dr. Warner noted that Carter "continues to be something of an

13

enigma with regard to the genesis of her pain." She noted that Carter suffered from constant, shifting musculoskeletal complaints, indicative of a psychosomatic component or significant central pain accentuation by some mechanism. An x-ray of Carter's feet revealed osteoarthritis of the first metatarsophalageal joints, more prominent on the left than the right. Dr. Warner concluded that at least some of Carter's problem consisted of inflammatory arthritis based predominantly on ankle pain, an elevated angiotensin converting enzyme level, low positive rheumatoid factor, and increased uptake in the ankles and metatarsal joints on bone scan. She reported that Carter had not improved on methotrexate and Plaquenil and continued to lack objective evidence of synovitis, despite complaints of joint pain. Upon examination, Dr. Warner noted a significant pronation of Carter's left foot with mild left genu valgus and opined that this could be contributing to Carter's left ankle pain.

Dr. Warner reported on April 18, 2006, that an x-ray of both of Carter's hands again revealed nothing out of the ordinary.

Dr. Gurba performed an arthroscopic surgery on Carter's left knee on April 18, 2006, for a lateral meniscal tear. Postoperatively, Dr. Gurba diagnosed Carter with a left knee lateral meniscal tear, chondromalacia grade 3, lateral femoral condyle and intercondylar notch.

In May 2006, Carter again presented to Dr. Warner reporting that her condition was no better or worse since stopping the methotrexate and Plaquenil the previous month. Carter was wearing a brace on her pronated left foot. She reported that she was taking two to three

14

hydrocodone per day for the pain, but understood that she should not take this medication long term. Dr. Warner opined that the main cause of Carter's pain is fibromyalgia.

Carter underwent another epidural steroid injection in her back at the right L5 level on August 25, 2006.

On October 18, 2006, Carter presented to Dr. Cameron Jones, M.D., at Rheumatology Specialists for a second opinion. Carter complained of joint pain in her hands, wrists, feet, and knees. Dr. Jones reported lots of swelling in Carter's hands, wrists, and around her ankles. He opined that Carter has arthralgias involving her upper extremities without evidence of definite synovitis. Dr. Jones further noted that Carter has deformity of her left hindfoot with valgus changes and collapse of her arch. He opined that this may represent inflammatory arthritic changes, and noted that it was painful for Carter to walk or stand on her foot unless she wore a brace.

On November 15, 2006, Dr. Jones reported that Carter complained mainly of discomfort involving her lower posterior neck around the C7 and in the adjacent upper back, aching down into her arms and hands. Dr. Jones noted that this pain was marked at times. Carter was wearing an elastic glove for her hand swelling. Dr. Jones reported a positive rheumatoid factor on a previous laboratory test. On examination, he noted that Carter was tender over the C7 and adjacent soft tissues of her upper back and neck, as well as through her left shoulder. She also had diffuse tenderness in her hands and tenderness to palpation in her wrists and hands. Carter had reduced range of motion of her neck secondary to pain and headaches. She wore a brace on her left ankle and her left knee was tender to movement

15

and palpation. Dr. Jones opined that he did not feel Carter had rheumatoid arthritis, but did have significant pain, degenerative joint disease of her knees, and soft tissue discomfort of her neck, upper back, and upper extremities.

On November 17, 2006, Carter returned to Dr. Gall with complaints of neck and bilateral arm pain radiating into her hands, as well as weakness and numbness in her hands. She also reported some difficulties with her legs, noting that she had to wear a brace on her left ankle. Dr. Gall noted depressed reflexes in the upper and lower extremities. A sensory examination revealed a decrease to light touch over the right shoulder. Dr. Gall noted that he was concerned about the possibility of a cervical disk herniation. In regard to the symptoms in her hands, Dr. Gall opined that this was likely a problem at C5/6 or lower. He further noted that Carter had some decreased sensation over her right shoulder suggesting a problem on the right at C4/5. Dr. Gall recommended Carter undergo an EMG for further evaluation.

On November 28, 2006, Carter presented to the emergency room with a severe headache. She reported that the pain affected her neck and her arms, making it difficult to function. An MRI of her brain was unremarkable. An MRI of the cervical spine revealed degenerative joint disease and a small disc/osteophyte complex with mild flattening of the thecal sac at C6-C7.

On November 29, 2006, Dr. Gurba certified with a reasonable degree of medical certainty that Carter's condition had not improved since he provided his opinion as to her RFC in July 2005.

16

### C. Opinion of the State Agency Medical Consultant

The ALJ also considered the opinion of Dr. Link, the state agency medical consultant. Dr. Link did not treat or examine Carter, but assessed Carter's RFC based upon his review of the documentary evidence in the record as of May 4, 2005, the date he prepared the "Physical Residual Functional Capacity Assessment." Dr. Link opined that Carter was limited to lifting less than ten pounds frequently, standing or walking at least two hours in an eight-hour workday, and sitting for about six hours in an eight-hour workday. He found that Carter was subject to all postural limitations on either an "occasional" or "never" basis. Dr. Link noted that Carter's total knee replacement did not preclude sedentary work. He noted that the focus of Carter's medical treatment had been on her knees, particularly her right knee, and that there had been only one mention of left hip pain. Finally, he concluded that there was no medically determinable impairment to support her complaints of hand and ankle pain, and that the medical records did not reflect any inflammatory condition in July 2004, or thereafter, to justify the presence of rheumatoid arthritis.

### D. Vocational Expert Testimony

Janice Hastert, a vocational expert ("VE") also testified before the ALJ. The VE identified Carter's past relevant work as a laundry attendant as an unskilled job at the medium exertional level. The ALJ asked the VE whether there was any work available for an individual of the same age, education, work experience, and RFC as Carter. Specifically, the ALJ asked the VE whether any work was available for a an individual who: (1) was capable of sitting for six of eight hours; (2) was capable of standing two out of eight hours;

(3) was capable of lifting ten pounds frequently; (4) had no limitations in pushing or pulling; (5) should never kneel, crouch, or crawl; (6) was capable of frequent handling; (7) had no visual, hearing, or speaking limitations; (8) should never be exposed to extreme hot or extreme cold; (9) should never be exposed to hazards, such as machinery or unprotected heights; and (10) had no mental limitations. The VE testified that while such a person would be incapable of performing work as a laundry attendant, unskilled sedentary work was available for this hypothetical individual. Examples of such work included the jobs of credit checker (Dictionary of Occupational Titles (DOT) 237.367-014; 2,200 positions in the State of Missouri; 55,000 nationwide); security systems monitor (DOT 379.367-010, 2,000 in the state; 100,000 nationwide; and document preparer (DOT 249.587-018; 595 in the state; 25,000 nationwide).

The ALJ then presented a second hypothetical with the additional requirement that one needed the ability to lie down for 45 minutes at least three times a day during an eight hour workday. The VE testified that such a person would not be able to sustain work with such a restriction.

On cross-examination, the VE testified that all work would be precluded if a person needed to elevate her legs three feet, three times a day for 30 to 45 minutes in duration. She further testified that a person would be allowed to miss just ten to twelve days of work per year, one day per month, before a job would be compromised. The VE noted that breaks in excess of a ten to fifteen minute break in the morning and afternoon and a 30 minute lunch break would not be allowed.

Case 4:07-cv-00699-NKL   Document 18   Filed 09/17/08   Page 18 of 30

## II. Discussion

In reviewing the Commissioner's denial of benefits, this Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007). "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007). The Court will uphold the denial of benefits so long as the ALJ's decision falls within the available "zone of choice." *See Casey v. Astrue*, 503 F.3d 687, 691 (8th Cir. 2007). "An ALJ's decision is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886).

### A. The ALJ's Decision

To establish her entitlement to benefits, Carter must have shown that she was unable to engage in any substantial gainful activity by reason of a medically determinable impairment or combination of impairments which could be expected to end in death or to last for a continuous period of not less than 12 months. *See* 42 U.S.C. § 423(d). For the purposes of the Act, Carter was not under a "disability" unless her impairment was so severe that she was unable to do her previous work or, considering her age, education, and work experience, any other kind of substantial gainful work which existed in the national economy. *Id.* The ALJ found that Carter did not meet this burden at any time from May 17, 2004, her amended onset date, to April 3, 2007, the date of the ALJ's decision.

The ALJ found that Carter had several severe impairments including: degenerative

joint disease of the bilateral knees, status-post total right knee replacement and arthroscopy of the left knee; mild degenerative joint disease of the left hip, bilateral feet and ankles, and cervical spine; degenerative disc disease of the lumbar spine, status-post surgical excision of a benign calcified lesion and laminectomy; mild left foot valgus; arthralgias in multiple body locations; mild obesity; hypothyroidism; mild erosive gastritis and esophagitis with intermittent reflux symptoms; a small hiatal hernia; and a small, benign, essentially asymptomatic, adrenal mass.

However, the ALJ determined that Carter did not have an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. pt. 404, subpt. P, app. 1 (2008). The ALJ found that Carter's subjective allegations about her condition only partially credible. The ALJ further found that Carter retained the residual functional capacity to perform a wide range of sedentary work. The ALJ found that Carter's impairments caused limitations that precluded her from performing her vocationally relevant past work, but that she could make a vocational adjustment to other work that existed in significant numbers in the national economy.

Carter raises two primary arguments on appeal. First, she argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to properly evaluate her credibility. Second, Carter argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to give the opinions of Carter's treating physicians sufficient weight.

**B.      Carter's Credibility**

Case 4:07-cv-00699-NKL   Document 18   Filed 09/17/08   Page 20 of 30

Carter challenges the ALJ's consideration of the objective evidence and her work history. She also alleges that the ALJ erred by not considering the testimony of her husband. In *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), the Eighth Circuit set forth factors the Commissioner must consider in evaluating subjective complaints. The factors the Commissioner must consider include: objective medical evidence; the claimant's work record and evidence relating to her daily activities; the duration, intensity and frequency of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions. *Id.* at 1322. The primary question is not whether the claimant experiences the subjective complaints alleged, but whether those symptoms are credible to the extent that their severity prevents her from performing substantial gainful activity. *See McGinnis v. Chater*, 74 F. 3d 873, 874 (8th Cir. 1996). The ALJ is not required to discuss each factor under *Polaski* in a methodical fashion before discounting Plaintiff's subjective complaints so long as the ALJ acknowledged and considered those factors. *See Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)). In this case, the ALJ recognized the factors that must be considered and provided a proper analysis. First, the ALJ noted that Carter's complaints of pain and the treatment she sought were not entirely consistent with her allegations. The record supports a finding that Carter was limited in her ability to stand and walk. She began to complain of pain in both knees in early 2004. Diagnostic studies revealed substantial degenerative changes and meniscal tears in Carter's knees. In May 2005, Carter underwent total knee replacement surgery on the right knee. In June 2006, after she recovered from left knee arthroscopy, she

21

was able to walk without an assistive device. Even though the ALJ found that Carter was credible as to the limitations related to her knee condition, she noted that those limitations did not preclude Carter from work that involved very little standing and walking.

The objective evidence was much less persuasive regarding Carter's complaints of pain in her wrists and hands. In September 2005, and again in April 2006, x-ray studies of both hands were entirely normal. Such evidence reasonably suggested to the ALJ that Carter could perform both gross and fine manipulative activities, as required for sedentary work. *See* Social Security Regulation (SSR) 83-10.

Second, the ALJ properly considered the failure of Carter's work record to support her credibility. Carter argues that the fact that she worked for several months after her amended alleged onset date should *enhance* her credibility because it shows that she was well motivated to work. In *Benskin v. Bowen*, 830 F.2d 878 (8th Cir. 1987), the Eighth Circuit held that whether a claimant's work record supports her credibility is a question for the Commissioner to consider. *Id.* at 883. Furthermore, the courts have found that when a claimant is employed after the alleged onset date, this may demonstrate an ability to perform substantial gainful activity. *See* 20 C.F.R. § 404.1571 (2008); *Naber v. Shalala*, 22 F.3d 186, 188-89 (8th Cir. 1994). This is true even when the claimant's work does not meet the level of substantial gainful activity. *See Browning v. Sullivan*, 958 F.2d 817, 823 (8th Cir. 1992) (holding that even work performed on a part-time basis or with considerable difficulty in spite of limitations still demonstrates an ability to perform substantial gainful activity).

The record showed that Carter worked from October 2004 through very nearly the

22

entire month of March 2005 in a job that required a medium level of exertion.  After

considering the income Carter derived from this work and the number of hours she worked,

the ALJ  concluded that this was not substantial gainful activity, so as to merit a finding of

"not disabled" at step one of the sequential evaluation process.  This evidence was sufficient,

however, to support the ALJ's finding that Carter was not as limited as she alleged in her

application filed March 28, 2005, or, indeed, on her alleged onset date, May 17, 2004.  *Goff*

*v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005) ("Working generally demonstrates an ability

to perform a substantial gainful activity."); *Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir.

2004) ("It was also not unreasonable for the ALJ to note that Harris's . . . part-time work

[was] inconsistent with her claim of disabling pain.").  The ALJ also noted Carter's

testimony that she never missed work due to her medical condition during this period.  While

she was accommodated, she was also doing work requiring a medium level of exertion.

Carter also contends that the ALJ erred in not evaluating the credibility of her

husband's testimony.  A careful reading of the ALJ's decision reveals, however, that while

the ALJ did not subject Mr. Carter's testimony to a detailed *Polaski* analysis, she did not

totally disregard it.  Although specific delineations of credibility are preferable, an ALJ's

"'arguable deficiency in opinion-writing technique'" does not require a court to set aside a

finding that is supported by substantial evidence.  *See Carlson v. Chater*, 74 F.3d 869, 871

(8th Cir. 1996), citing *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992), quoting

*Benskin*, 830 F.2d at 883.  The ALJ noted that Carter and her husband testified that she

needed to lie down several times a day for extended periods of time.  The ALJ also noted that

their testimony did not "establish the extreme degrees of pain and physical limitations and restrictions that Plaintiff and her husband alleged." Consequently, the ALJ found their testimony "no more than only partially credible." *See Robinson*, 956 F.2d at 841 (a finding concerning the credibility of third party evidence may involve the same evidence used to find a claimant not credible).

The ALJ also noted several inconsistent statements by Carter. Although Carter alleged extreme pain in her back, she told Dr. Warner in April 2005 that her back was "doing pretty well lately." Carter testified that hydrocodone made her so drowsy that she occasionally needed to lie down. This conflicted with Carter's report that she took this same medication from October 2004 to March 2005, a six month period during which she worked at the laundry and never had to miss work due to her medical condition. The ALJ also noted that Carter never complained that she needed to lie down during her seven-hour shifts. Finally, the ALJ noted that although Carter claimed that she needed to elevate her feet the height of a normal-sized bed three times a day, three of her treating physicians agreed that there was no medical need for her to do so.

The ALJ considered evidence suggesting that Carter exaggerated her symptoms at times. *See Jones v. Callahan*, 122 F.3d 1148, 1152 (8th Cir. 1997) (holding that an ALJ may properly consider a claimant's exaggeration of his symptoms in evaluating his subjective complaints). Dr. Ervin, a specialist in rheumatology and internal medicine, noted that his findings upon examination did not support Carter's complaints of symptoms. Dr. Warner noted that she found it difficult to interpret her complaints of chronic pain, because she

24

exhibited "evidence of sick role behavior and hypervigilance."

Finally, the ALJ properly considered whether Carter's reported activities of daily living supported her allegations of disability. Even where a claimant's reported daily activities show some limitations, the ALJ is not required to believe all of a claimant's assertions concerning her activities. *See Johnson v. Chater*, 87 F.3d 1015, 1018 (8th Cir. 1996). Carter testified that she lived with her husband in a two-story house. Her husband did most of the dusting, cleaning, and bedmaking, although she did some cooking. She did not leave the house without her husband and needed a cane for ambulation. She spent a lot of time reading. The ALJ found that Carter was not very limited except as to those activities that involved prolonged weightbearing, primarily due to her bilateral knee pathology.

"Subjective complaints of pain may be discounted if there are inconsistencies in the evidence as a whole." *Box v. Shalala*, 52 F.3d 168, 171 (8th Cir. 1995), quoting *Polaski*, 739 F.2d at 1322. In finding Carter and her husband's testimony to be only partially credible, the ALJ considered the objective medical evidence, the medical opinions of Carter's treating physicians, Carter's work during periods of alleged disability, the credibility of her husband, her symptom magnification, inconsistent statements, and activities of Carter's daily life. While any one of the above inconsistencies might not alone be enough to undermine the credibility of Carter's subjective complaints, the totality of the inconsistencies provide, at the very least, substantial evidence supporting the ALJ's decision that Carter was not fully credible. The ALJ articulated the inconsistencies on which she relied in discrediting Carter's testimony regarding her subjective complaints. The ALJ's credibility finding is supported

Case 4:07-cv-00699-NKL   Document 18   Filed 09/17/08   Page 25 of 30

by substantial evidence on the record as a whole.  *See Pena*, 76 F.3d at 908.

### C.    Weight Given to Opinions of Treating Physicians

Carter next argues that the ALJ erred in not giving controlling weight to the opinions of her treating physicians.  Those physicians indicated that, while Carter retained the capacity for a significant range of sedentary exertion, she was subject to certain nonexertional limitations that were inconsistent with full-time work.  Although the opinions of a treating physician are entitled to substantial weight, *see Chamberlain v. Shalala*, 47 F.3d 1489, 1494 (8th Cir. 1995), citing *Ward v. Heckler*, 786 F.2d 844, 846 (8th Cir. 1986), such an opinion is not conclusive and must be supported by medically acceptable clinical or diagnostic data. *See Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998)*; Trossauer v. Chater*, 121 F.3d 341, 343 (8th Cir. 1997).

While the ALJ properly denied "controlling" weight to these opinions, she concluded that they were entitled to "significant" weight.  As the ALJ pointed out in her decision, the records of Carter's treatment do not support her treating physicians' opinions in their entirety.  Dr. Warner and Dr. Langholz both opined that Plaintiff would miss more than one day of work per month and that she would need to take unscheduled breaks throughout the workday, but neither physician identified the basis for her opinion regarding absenteeism from the workplace.  *See* 20 C.F.R. § 404.1527(d)(3) (2008) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.").  As to their assessments of Carter's need for breaks during the work day, the ALJ properly found that these were largely

26

compatible with the breaks customary in the typical work place, as described by the vocational expert at the hearing and as contemplated in SSR 96-8p.

The treatment notes of Dr. Warner and the RFC questionnaire she completed yield conflicting assessments of Carter's medical condition during the period of her alleged disability. Dr. Warner opined on the RFC questionnaire that Carter was restricted to using her arms for reach only five percent of a normal workday or using her hands and fingers only twenty to thirty percent of a normal workday. Because manipulative activities are a key component of sedentary work, such limitations would significantly reduce the range of work available to Carter. *See* SSR 83-10. However, Dr. Warner twice noted that x-ray studies were negative for degenerative pathology in Carter's hands, and physical examinations revealed no significant loss of functioning of the bilateral upper extremities and hands. Further, Dr. Warner observed that emotional factors contributed to the severity of Carter's symptoms and functional limitations and that her reported pain was greater than Dr. Warner would expect, based on physical findings.

The ALJ also noted inconsistencies with the opinions of Carter's other treating physicians. Dr. Langholz opined that Carter would have difficulty dealing with the stress of employment because of her pain. The ALJ contrasted Dr. Langholz's opinion with evidence showing that Carter showed up on time on a regular basis for her scheduled post-operative physical therapy appointments. Moreover, Dr. Langholz's opinion also conflicted with Carter's own statements denying difficulty in handling stress, changes in routine, getting along with others, and following instructions. Dr. Langholz, along with Dr. Warner and Dr.

27

Gurba, also opined that Carter's pain would interfere with the attention and concentration needed to perform even simple work tasks. The ALJ pointed out that this opinion, as well as Dr. Langholz's opinion regarding Carter's ability to deal with stress, was inconsistent with Carter's contemporaneous, regular and continuing attendance at her job as a laundry attendant from early October 2004 through late March 2005. Further, these opinions were not consistent with other evidence of record, including Carter's credible subjective complaints. *See* 20 C.F.R. § 404.1527(d)(4) (2008) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

The ALJ noted a significant inconsistency common to all three medical opinions that is directly related to the ALJ's analysis of Carter's credibility. The three physicians indicated that Carter's functional limitations were present as early as May or July of 2004. Without a doubt, those limitations would preclude an individual from performing work as a laundry attendant, at the medium level of exertion. Yet, that is exactly what Carter did for the first six months of her alleged period of disability.

Carter also argues that it was improper for the ALJ to give "controlling" weight to the opinion of Dr. Link, the State agency medical consultant. The Commissioner's regulation authorizes the ALJ to "consider all evidence from nonexamining sources to be opinion evidence." *See* 20 C.F.R. § 404.1527(f) (2008).

The ALJ properly explained her rationale for giving significant weight to Dr. Link's opinion. Dr. Link was a board-certified specialist in physical healthcare. He possessed specific expertise regarding the evaluation of work-related limitations arising from physical

28

impairments under the disability programs administered by the Social Security Administration. *See* 20 C.F.R. § 404.1527(f)(2)(i) (2008). The ALJ also noted that Dr. Link's finding that Carter retained the capacity for sedentary work was generally consistent with the findings of Carter's treating physicians.

### D. Carter's Residual Functional Capacity

The ALJ found that Carter could perform other work that existed in significant numbers in the economy. At step four of the sequential evaluation process, the ALJ found that the demands of Carter's past work as a laundry attendant exceeded her RFC for the relevant period. This shifted the burden to the Commissioner to give evidence of other jobs that were consistent with the RFC finding. When a claimant's capacity is further restricted by significant nonexertional limitations, as in the instant case, the Commissioner must obtain evidence from a VE in order to meet this burden.

The ALJ asked the VE whether there was any work available for an individual of the same age, education, work experience, and RFC as Carter. The VE testified that unskilled sedentary work was available for this hypothetical individual. Examples of such work included the jobs of credit checker (Dictionary of Occupational Titles (DOT) 237.367-014; 2,200 positions in the State of Missouri; 55,000 nationwide); security systems monitor (DOT 379.367-010; 2,000 in the state; 100,000 nationwide); and document preparer (DOT 249.587-018; 595 in the state; 25,000 nationwide).

This testimony was substantial evidence to support the ALJ's finding that Carter was not disabled at step five because she could perform other work. The ALJ's hypothetical

29

question to the VE included her findings as to Carter's credible job-related limitations. Although the hypothetical question must set forth with reasonable precision the claimant's impairments, *Starr v. Sullivan*, 981 F.2d 1006, 1008 (8th Cir. 1992), it need only include those impairments and limitations found credible by the ALJ. *See Pertuis v. Apfel*, 152 F.3d 1006, 1007 (8th Cir. 1998). The ALJ had no obligation to include any of Plaintiff's alleged limitations that she properly discounted. *Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005) ("Discredited complaints of pain, however, are properly excluded from a hypothetical question so long as the ALJ had reason to discredit them.").

## III.    Conclusion

Accordingly, it is hereby

ORDERED that Carter's Petition [Docs. ## 4, 15] is DENIED.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  September 17, 2008
Jefferson City, Missouri

Case 4:07-cv-00699-NKL   Document 18   Filed 09/17/08   Page 30 of 30